# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| AIDA SHYEF AL-KADI, | Civil No. 16-2642 (JRT/TNL) |

Plaintiff,

v.

RAMSEY COUNTY; RAMSEY
COUNTY SHERIFF'S OFFICE; and
OFFICER JESSICA WALKER, OFFICER
RITA BASKFIELD, SERGEANT
LUGENE WERNER, OFFICER
ALLISON SCHABER, and OFFICER
DAN FRERICHS, *in their official and
individual capacities*,

Defendants.

**MEMORANDUM OPINION
AND ORDER**

---

Caitlinrose H. Fisher and Virginia R. McCalmont, **GREENE ESPEL
PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402, for
plaintiff.

Robert B. Roche and Kimberly R. Parker, **RAMSEY COUNTY
ATTORNEY'S OFFICE**, 121 Seventh Place East, Suite 4500, St. Paul, MN
55101, for defendant.

Plaintiff Aida Shyef Al-Kadi ("Al-Kadi") brings this action against Ramsey County,

the Ramsey County Sheriff's Office ("RCSO"), and numerous officers and a sergeant in

their official and individual capacities (collectively "Defendants").  Al-Kadi alleges that

she suffered religious discrimination by Defendants' during a brief detention at the Ramsey

County Adult Detention Center ("ADC") in August 2013.  She brings claims under the

First and Fourteenth Amendments to the U.S. Constitution, the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"), Article I of the Minnesota Constitution, and the Minnesota Human Rights Act ("MHRA"). She claims that Defendants substantially burdened and interfered with her right to freely exercise her sincerely held religious beliefs by failing to accommodate her religious dress and subjected her to harsher treatment than other detainees based on her religion.

The Court has before it Defendants' Motion for Summary Judgment, which the Court will grant in part and deny in part. No genuine dispute of material fact remains as to Al-Kadi's RLUIPA claim based on wearing a bedsheet, her Free Exercise claim, her Equal Protection Claim against the county defendants, and her claim for injunctive relief to the extent that it reaches any conduct beyond the booking photo. As such, the Court will grant Defendants' Motion on those issues. Because genuine disputes of material fact remain as to the remainder of Al-Kadi's RLUIPA Claim, her Equal Protection Claim against the individual defendants, her state law claims, and damages, the Court will deny Defendants' Motion on those issues.

The Court also has before it Al-Kadi's Motion to Exclude the Expert Testimony of Odeh Muhawesh. Because all of Muhawesh's opinions are inadmissible or, alternatively, should be excluded under Federal Rule of Evidence 403, the Court will grant the motion.

# BACKGROUND

## I.    FACTUAL BACKGROUND

### A.    Al-Kadi's Religious Beliefs

Al-Kadi is and has always been a practicing Muslim.  (Aff. of Caitlinrose Fisher ("Fisher Aff.") ¶ 3, Ex. 1 ("Al-Kadi Dep.") at 15, Nov. 21, 2018, Docket No. 84.)  She has even made the pilgrimage to Mecca.  (*Id.* at 21-22.)  As part of her religious beliefs, Al-Kadi practices hijab, which she describes as "coverage" or "wearing clothes that are modest."  (*Id.* at 16-17.)  As part of the practice of hijab, Al-Kadi wears a hijab, which is a head scarf that covers her hair, neck, and shoulders.  (*Id.* at 18-19.)  According to Al-Kadi, a hijab need not be made of a particular fabric or pattern.  (*Id.* at 20-21.)  However, other limitations apply.   (*Id.* at 19.)  For example, a hijab cannot be see-through or a rug from the ground.  (*Id.* at 19-21.)  As part of the practice of hijab, Al-Kadi also wears an abaya, which is a loose-fitting garment worn to avoid showing the body's figure.  (*Id.* at 17, 21.)  Al-Kadi's faith requires her to wear a hijab and abaya in the presence of non-related males, when she goes out in public, and during prayer.  (*Id.* at 21-22.)  Medical reasons and emergencies (e.g., running out of a burning house) are the only exceptions of which Al-Kadi is aware.  (*Id.* at 22-23.)

### B.    Al-Kadi's Detention at the ADC

On August 12, 2013, Al-Kadi self-reported to Hennepin County for outstanding warrants related to traffic violations.  (*See id.* at 36-37; Fisher Aff. ¶ 3, Ex. 2 at 254, Nov. 21, 2018, Docket No. 84.)   She was transferred to the ADC because she also had an

outstanding warrant in Ramsey County for driving after revocation. (*See* Fisher Aff. ¶ 3, Exs. 3-4 at 256-59.) The ADC is run by the RCSO. (Fisher Aff. ¶ 3, Ex. 5 ("1st Schaber Dep.") at 262, Nov. 21, 2018, Docket No. 84.)

### 1. Sally Port

Al-Kadi was brought to the ADC by two "transport deputies," one male and one female. (*See* Aff. of Robert Roche ("Roche Aff.") ¶ 4, Ex. C ("Baskfield Dep.") at 27, May 31, 2018, Docket No. 68.) Transport deputies are responsible for transporting detainees between facilities. (*Id.*)[1] Al-Kadi arrived at the ADC with three other female detainees. (Roche Aff. ¶ 2, Ex. A ("Video") - Open Booking SP at 00:34,[2] May 31, 2018, Docket No. 69.) She was first brought into the sally port of the ADC, where protocol requires staff to thoroughly pat-down all incoming detainees for safety reasons. (*See id.*; Roche Aff. ¶ 3, Ex. B ("Werner Dep.") at 7-8.)

Upon Al-Kadi's arrival in the sally port, Officer Rita Baskfield told her to remove her hijab and abaya. (Al-Kadi Dep. at 34, 102.) Al-Kadi told her she did not want to remove her hijab in front of males because she is Muslim. (Baskfield Dep. at 30.)

The patdown requires detainees to remove headwear and outer layers. (Werner Dep. at 8-9.) If a detainee is being "confrontational," or resisting orders during the intake process, ADC staff separate the "confrontational" detainee from the others and move him

---

[1] Defendants claim that "[t]ransport deputies do not assist with searches," (Defs.' Mem. Supp. at 2), but there does not appear to be any record evidence to support this assertion.

[2] Citations to video files, which were provided to the Court on a USB drive, will be referred to as "Video – [Name of File]" and will include the approximate time if relevant.

or her to a smaller holding cell to conduct the patdown. (*Id.* at 9-10.) Defendants contend that Al-Kadi was being "noncompliant" because she refused to face the wall in the sally port in order to be searched. (Defs.' Mem. Supp. at 2-3, Oct. 30, 2018, Docket No. 67.)

In her deposition, Al-Kadi acknowledges that, in the video, there is a moment when she is the only detainee not facing the wall. (Al-Kadi Dep. at 101.) However, she also states that Baskfield told her to turn around. (*Id.* at 114.) The video, which does not have sound, shows that Al-Kadi faced the wall at first, along with the other detainees. (Video – Open Booking SP at 1:15.) Baskfield put a hand on Al-Kadi's shoulder, and Al-Kadi turned around. (*Id.* at 1:25.) Al-Kadi and Baskfield spoke for about 20 seconds, and Al-Kadi repeatedly touched her hijab and shook her head. (*Id.* at 1:45-2:05.) Al-Kadi then briefly turned back to face the wall, Baskfield touched her arm or abaya, and Al-Kadi turned toward her again. (*Id.* at 1:45-1:48.) Al-Kadi and Baskfield appeared to disagree about something, and Baskfield grabbed Al-Kadi's arm and forcibly removed her from the sally port. (*Id*. at 1:50-1:58.

While Baskfield forced Al-Kadi out of the sally port, Officer Dan Frerichs took Al-Kadi's other arm and appeared to speak to her. (Video – Open Booking Desk 1 at 1:58.) Baskfield then escorted Al-Kadi to a wall in the open booking area and held her against the wall. (*Id.* at 2:11.) Al-Kadi testified that, while she was being "pulled or yanked down the hall," a male officer—presumably Frerichs—told her that if she did not do what she was told, they would "take [her] down to a cell somewhere in the bottom of the hidden – the black cell, somewhere down there." (Al-Kadi Dep. at 211-12.)

## 2. Patdown in the Holding Cell

Baskfield and Frerichs then escorted Al-Kadi to a holding cell. (*See* Video – Open Booking Desk 1 at 2:30.) According to Baskfield, they took Al-Kadi to the holding cell because she refused to follow directions and take off her hijab. (Baskfield Dep. at 28.) Baskfield said that Al-Kadi was not put in the holding room as punishment, but rather to calm down and "[f]or the safety of the other people out in the booking area." (*Id.* at 29.)

In the holding cell, after more than a minute of back-and-forth with the officers, Al-Kadi removed her hijab. (Video – Open Booking HR 5 at 1:00-1:30.) Throughout all of this, Frerichs stood inside the holding cell with Baskfield, facing Al-Kadi. (*See id.*) Frerichs observed Al-Kadi for approximately 34 seconds with her hijab off. (*See id.*; Al-Kadi Dep. at 126.) Before Al-Kadi fully removed her abaya, Frerichs moved into the doorway of the cell, where he could not see Al-Kadi. (Video – Open Booking HR 5 at 2:04.) Al-Kadi removed her abaya, and Baskfield searched her. (*Id.* at 2:36.) After the patdown, Baskfield returned Al-Kadi's abaya and hijab to her. (*Id.* at 4:00.)

To Baskfield's recollection, she was the only female officer on the first floor when Al-Kadi arrived, although there were five or six officers in the booking unit. (Baskfield Dep at 30.) Defendants claim that the other female ADC officers that interacted with Al-Kadi did not come on duty until later that afternoon. (Defs.' Mem. Supp. at 3.)

Defendants contend that Frerichs had to remain in the holding cell with Baskfield and Al-Kadi while Al-Kadi removed her hijab and abaya because, for safety reasons, two officers must always be in a holding room with a detainee. (Baskfield Dep. at 31.) Baskfield noted that the safety risk was greater because Al-Kadi outweighed her by more

than 70 pounds.  (*Id.*)  Nevertheless, Baskfield testified that she asked Frerichs to step out of the room before Al-Kadi removed her abaya because Al-Kadi "was being compliant at that time."  (*Id.* at 32.)  But Frerichs remained in the doorway so that the door would not shut and lock Baskfield in.  (*Id.* at 33.)

Al-Kadi claims that Frerichs's viewing of her without her hijab violated her religious beliefs and deeply humiliated her.  Al-Kadi maintains that she was respectful and never aggressive towards the officers during any of this time.  (Al-Kadi Dep. at 80, 108-111, 115.)

After her initial patdown, Al-Kadi spent more than two hours alone in the holding cell.  (*Id.* at 145.)  While there, she wore her hijab and abaya.  (*Id.* at 142, 146.)  She also prayed and performed a religious ablution.  (*Id.* at 142-44.)

### 3.  Intake and Booking

Al-Kadi left the holding cell briefly for an intake interview with Frerichs, and she was allowed to wear her religious apparel even though others were not wearing outer garments in the booking area.  (*See id.* at 134-38.)  Frerichs did not check the "not cooperative" box on Al-Kadi's intake form.  (Fisher Aff. ¶ 3, Ex. 7 at 297, Nov. 21, 2018, Docket No. 84.)  Likewise, Baskfield did not file an incident report because she felt there was no reason to do so.  (Fisher Aff. ¶ 3, Ex. 6 at 293, Nov. 21, 2018, Docket No. 84.)

Later in the afternoon, Al-Kadi was taken out of the holding cell and continued through the rest of the booking process.  She argues that Sergeant Lugene Werner treated her differently than other detainees during this process by standing behind her while she

was at the booking counter and following her to the booking station.  (Pl.'s Mem. Opp. at 6; *see also* Video – Open Booking ID Interview part 1.)

### 4. Booking Photo

Al-Kadi was told to remove her hijab for her booking photo.[3]  (Al-Kadi Dep. at 72-75; *see generally* Video – Open Booking ID Photo at 10:27-13:30.)  Al-Kadi was hesitant to do so.  (Roche Aff. ¶ 7, Ex. F ("2d Schaber Dep.") at 94.)  Al-Kadi told Officer Allison Schaber that she did not want to remove her hijab because there were men in the open booking area.  (1st Schaber Dep. at 269.)  Schaber perceived Al-Kadi as being "uncooperative by not complying with the identification process, specifically the photographing" and testified that she was "refusing the directives for the photograph." (*Id.* at 266-67.)

To accommodate Al-Kadi, the officers locked up all the male detainees so that Al-Kadi could remove her hijab without them seeing.  (2d Schaber Dep. at 96-97.)  The female officers also told the male officers to leave the area.  (*Id*. at 97.)  Al-Kadi claims that she was told the photo would never be released or shown to men, so she removed her hijab for the photo.  (Fisher Aff. ¶ 3, Ex. 9 ("2d Al-Kadi Dep.") at  398-99, 400, Nov. 21, 2018, Docket No. 84.)

Werner testified that Al-Kadi had to remove her hijab for the photo "for identification" throughout the facility.  (Fisher Aff. ¶ 3, Ex. 8 ("2d Werner Dep.") at 347,

---

[3] Al-Kadi testified that officers attempted to forcibly remove her hijab for her.  (Al-Kadi Dep. at 72-75.)  The video does show officers reaching for her hijab, although their intentions are unclear.  (*See* Video – Open Booking ID Photo at 11:30-13:50.)

Nov. 21, 2018, Docket No. 84.)  Booking photos are put on detainees' wristbands.  (*Id.*)

When asked whether officers gave Al-Kadi the option of taking two photos, one wearing

the hijab and one with the hijab removed, Werner testified that, "back then – I think we

only took . . . the one photo."  (*Id*. at 365-66.)  Werner also confirmed that ADC policy

requires that the photo be placed on the wristband, that the wristband remain on the inmate

the entire time that they are detained, and that the photo be visible.  (*Id*. at 366-67.)

### 5.  Bedsheet

After the officers took her booking photo, they gave Al-Kadi a bedsheet to replace

her hijab.  (Video – Open Booking ID Photo at 15:20; Al-Kadi Dep. at 92.)  Al-Kadi felt

humiliated, because "[a] bed sheet belongs on a bed . . . not a human being."  (*Id.* at 92,

184-85.)  The ADC does not allow detainees to wear scarves because they can be used to

choke others.  (2d Schaber Dep. at 98.)  Schaber said that the bedsheet was not deemed

"better" than the hijab, it was simply "what [the ADC] had to accommodate her request"

and what the ADC had "done for other inmates."  (*Id*.)

Werner testified that, when a Muslim women wearing a hijab went through booking,

the ADC would give the woman a scarf or sheet to use.  (2d Werner Dep. at 332-33, 340-

41.)  She stated that the bedsheets were what ADC officers were "using at the time for

headgear" because they did not allow people to keep their own headgear or outer clothing

on.  (*Id.* at 340-41.)  Werner stated that, "policy-wise," she could not allow Al-Kadi to wear

her own hijab.  (*Id.* at 346-47.)

### 6. Change of Clothes

Eventually Al-Kadi was also told to remove her abaya and change into a prison uniform. (Al-Kadi Dep. at 78-79.) The uniform was not loose fitting. (*Id.* at 78.) When she changed, two female officers were in the room with her and they did not allow her to use the dressing room. (*Id.* at 195.) Al-Kadi was forced to walk naked across the room in front of them. (*Id.*) She felt that this was humiliating and violated her religion. (*Id.* at 195-96.) The officers told her that she was being disrespectful and purposefully changing at a slow place. (*Id.* at 197.)

Ramsey County policy provides that "misdemeanor inmates," such as Al-Kadi, "will not be viewed without clothing." (Fisher Aff. ¶ 3, Ex. 10 at 413, Nov. 21, 2018, Docket No. 84.)

### 7. 23-Hour "Lock In"

One of the officers that interacted with Al-Kadi, Officer Jessica Walker (previously Hejny), wrote a report several hours after Al-Kadi's booking photo was taken. (2d Werner Dep. at 375-76; Fisher Aff. ¶ 3, Ex. 12 ("Incident Report") at 423, Nov. 21, 2018, Docket No. 84.) The report stated that, "[f]or her failure to comply with [ADC staff's] directives and for the disrespect to staff," Al-Kadi was placed in a 23-hour "lock in." (Incident Report at 424.) A lock in is when a detainee is locked in his or her cell for 23 hours, sometimes alone and sometimes with a roommate. (2d Werner Dep. at 383.) The detainee is not allowed to mingle in open space. (*Id.*) In Al-Kadi's case, the lock in was a punishment for her "argumentative behavior and not following the . . . process." (*Id.* at 384.)

### C.    Public Release of Al-Kadi's Booking Photo

Al-Kadi originally insisted that she saw her Ramsey County booking photo online on a website called mugshots.com.  (Al-Kadi Dep. at 39.)  However, the photo and information shown on that website were from Hennepin County, not Ramsey County.  (*Id.* at 44-45.)  The Council on American Islamic Relations ("CAIR") of Minnesota petitioned mugshots.com to have the photo removed.  (*Id*. at 42-43.)

In May 2018, Al-Kadi conducted a web search of herself and found the Ramsey County booking photo on a website called bustedmugshots.com.  (Roche Aff. ¶ 10, Ex. I at 140-42.)  She does not know when the photo first appeared or how many people may have viewed it.  (2d Al-Kadi Dep. at 397, 402.)  Al-Kadi's disclosure of this website was after discovery, at which time the RCSO searched the website and found no evidence that Al-Kadi's photo was there.  (Aff. of John Eastham ¶ 4, Oct. 30, 2018, Docket No. 71.)

The RCSO does not post booking photos online; however, it is legally obligated to release booking photos to members of the public upon request.  (*Id.* ¶ 2.)  A member of the public, Kyle Prall, submitted such a request on November 8, 2013.  (*Id.* ¶ 3.)  He requested a large batch of data including booking photos and information for dates covering Al-Kadi's booking.  (*Id.*)  RCSO records show that staff worked on compiling data responsive to that request but do not confirm that the data was actually produced by Ramsey County or collected by Prall.  (*Id.*)  Prall is known to collect booking data and publish it on bustedmugshots.com.  (*See generally* Fisher Aff. ¶ 3, Exs. 25-27, Nov. 20, 2018, Docket No. 82.)

## II.    PROCEDURAL BACKGROUND

Al-Kadi filed this case on August 4, 2016.  (Compl., Aug. 4, 2016, Docket No. 1.)

She filed the Second Amended Complaint on June 15, 2018.  (2d Am. Compl., June 15,

2018, Docket No. 60.)  Defendants filed the present Motion for Summary Judgment on

October 30, 2018.  (Mot. for Summ. J., Oct. 30, 2018, Docket No. 65.)  Al-Kadi then filed

a motion to exclude the expert testimony of defense witness Odeh Muhawesh.  (Mot. to

Exclude, Nov. 1, 2018, Docket No. 73.)

## DISCUSSION

## I.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact

and the moving party can demonstrate that it is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a

dispute is genuine if the evidence is such that it could lead a reasonable jury to return a

verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The

Court must view the facts in the light most favorable to Al-Kadi, the nonmoving party, and

give her the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court may not

"weigh the evidence, make credibility determinations, or attempt to determine the truth of

the matter."  *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## B.     RLUIPA

The Court will deny Defendants' Motion for summary judgment as to Al-Kadi's RLUIPA claim to the extent that it is based on forcing her to remove her hijab in front of Frerichs, forcing her to take a booking photo without her hijab, and the cumulative effects of Defendants' policies. However, it will grant the motion as to the RLUIPA claim to the extent that it is based on providing Al-Kadi with a bedsheet in place of her hijab.

Congress adopted RLUIPA "in order to provide very broad protection for religious liberty." *Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 (2014)). RLUIPA prohibits the government from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability." 42 U.S.C. § 2000cc-1(a). Imposition of the burden does not violate RLUIPA if the government can show that it "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.*

As a preliminary matter, RLUIPA does not authorize individual-capacity claims. *See, e.g., Brooks v. Roy*, No. 12-CV-316 SRN/JSM, 2014 WL 127024, at *16 (D. Minn. Jan. 14, 2014) (collecting cases), *aff'd on other grounds*, 776 F.3d 957 (8th Cir. 2015). Al-Kadi clarifies that her RLUIPA claims are against Ramsey County, the RCSO, and the individual defendants in their official capacities.

Actions against county departments—and individuals in their official capacity—are actions against the county itself. *See Flores v. United States*, 689 F.3d 894, 899 n.4 (8th

Cir. 2012) (noting that "Ramsey County Sheriff's Department, the Ramsey County Adult Detention Center, and the Ramsey County Department of Public Health were dismissed because they are not legal entities capable of being sued."); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (noting that "the real party in interest in an official-capacity suit is the governmental entity and not the named official"). As such, the Court considers the RLUIPA claim only as against Ramsey County.

Defendants argue that any claim against Ramsey County fails because: (1) Al-Kadi failed to allege or present evidence that the ADC receives federal funding; (2) there is no evidence of a custom, policy or practice; and (3) the claims are meritless.

### 1.     Receipt of Federal Funding

RLUIPA applies only to substantial burdens imposed in a "program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b). "Program or activity" is defined as "all of the operations of any entity," 42 U.S.C. § 2000cc-5(6), including "(A) a department, agency, . . . or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency . . . to which the assistance is extended . . . ." 42 U.S.C. § 2000d-4a(1).[4]

---

[4] The Court finds this definition to be far from clear. It is not clear where to draw the line between "operations of" government entities and the entities themselves. For example, Defendants contend that allegations against the Minnesota Sex Offender Program ("MSOP") would clearly be sufficient for RLUIPA jurisdiction, while allegations against the State of Minnesota would not. (Defs.' Reply Mem. at 2, Nov. 30, 2018, Docket No. 86.) But the Court sees no reason to treat the MSOP differently from the RCSO in the context of this case. While MSOP may have "program" in its name, it operates facilities just like the RCSO does.

Defendants make two arguments regarding whether this action is covered by RLUIPA. First, Defendants argue that Al-Kadi's claim should be dismissed because her Complaint failed to allege receipt of federal funds. Second, Defendants argue that, even if the claim were sufficiently pled, they are entitled to summary judgment because there is no evidence that the ADC itself receives federal funds.

As to deficiencies in the Complaint, Al-Kadi specifically cited to 42 U.S.C. § 2000cc-1. Subsection (b) of this section states that RLUIPA applies when "the substantial burden is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b). The Complaint also specifically alleged that the ADC "is owned, operated, or managed by, or provides public services on behalf of, any political subdivision of the state." (2d Am. Compl. ¶ 94.) The Court finds that dismissal of the RLUIPA claim is not warranted based on pleading deficiencies because a fair reading of the Complaint would put Defendants on notice as to the jurisdictional basis of her RLUIPA claim. Nevertheless, for the sake of clarity, the Court will grant Al-Kadi's request to amend her complaint as to the limited issue of RLUIPA's threshold requirements.[5]

Defendants also argue that they are entitled to summary judgment because Al-Kadi has not submitted evidence that the ADC itself receives federal funding. But it is undisputed that the RCSO runs the ADC, and Al-Kadi has submitted evidence that the RCSO received federal funding at the time of the events of this case. (*See* Fisher Aff. ¶ 3,

---

[5] Leave to amend should "be freely given when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Court finds that justice requires leave to amend in this case and sees no prejudice to Defendants stemming from such a minor amendment because the Complaint gave Defendants fair notice. Furthermore, Defendants never moved to dismiss on this ground.

Ex. 28 at 48-55, Nov. 20, 2018, Docket No. 82.)  Defendants do not dispute this evidence. The Court will find this evidence sufficient to satisfy RLUIPA's threshold requirements.

There appears to be no controlling precedent on the exact question of what level of government program or activity must receive federal funding for RLUIPA to apply. Defendants present several cases to support their position that Al-Kadi must show that the ADC itself receives federal funds.  But none of the cases offered is controlling and none directly stands for the Defendants' proposition.  Indeed, some of the cases seem to support Al-Kadi's position that it is enough to show that the RCSO receives federal funding.

For example, in *Murray v. Kansas Department of Corrections*, a court dismissed a RLUIPA claim because the plaintiff had not alleged that the Kansas Department of Corrections received federal funding.  No. 07-3276-EFM, 2009 WL 1617664, at *3 (D. Kan. June 9, 2009).  The court did **not** state that the plaintiff needed to allege that the specific facility in which he was held received federal funding.  *See id*.  Here, Al-Kadi has presented evidence that the RCSO receives federal funding and that the RCSO runs the ADC.  Thus, this evidence would seem to be sufficient under *Murray*.

In *Gutman v. Wriggelsworth*, the court dismissed a RLUIPA claim because plaintiff had "not alleged that **Defendants**," which included the county but not the jail in which plaintiff was held, received federal funding.  No. 1:09-CV-628, 2010 WL 1814816, at *1, 4 (W.D. Mich. Feb. 4, 2010) (emphasis added), *adopted by*, 2010 WL 1814778 (W.D. Mich. May 5, 2010).  Here, Al-Kadi has shown that the county and the RCSO receive federal funding, which may satisfy *Gutman*.

In *Bishop v. Jessen*, a magistrate judge recommended dismissal of a RLUIPA claim because the plaintiff "allege[d] no facts relating to [RLUIPA's] threshold requirements." No. CV 14-1898 (ADM/SER), 2016 WL 8674584, at *18 (D. Minn. Feb. 12, 2016), *adopted by*, 2016 WL 906422 (D. Minn. Mar. 9, 2016). But the magistrate judge noted that these deficiencies might be cured by an amended pleading that included allegations that the education department of the Minnesota Sex Offender Program ("MSOP") received federal funding, even though the plaintiff was challenging dietary practices in the MSOP's Moose Lake facility. *Id.* In the present case, it is enough to allege that the RCSO, which runs the ADC, receives federal funding, just like it would have been enough to allege that the MSOP, which ran the Moose Lake facility, received federal funding.

*Ephraim v. Angelone* comes closest to supporting Defendants' position, in that the court dismissed a plaintiff's RLUIPA claim because he had not alleged that the correctional center or the dietary program at issue received federal funding. 313 F. Supp. 2d 569, 575 (E.D. Va.), *aff'd*, 68 F. App'x 460 (4th Cir. 2003). But *Ephraim* did not consider the specific question at issue here: which level of government operation must receive federal funding. There is no indication that the plaintiff in *Ephraim* had made allegations about federal funding at any level.

The Court finds that evidence that Ramsey County and the RCSO receive federal funding is sufficient for Al-Kadi's RLUIPA claim to survive summary judgment on the threshold funding requirement and will deny Defendants' motion on this ground.

## 2.      Custom, Policy, or Practice

Al-Kadi can only establish RLUIPA liability against a municipality if the alleged violation is the result of the municipality's custom, policy, or practice.  *See Van Wyhe v. Reisch*, 581 F.3d 639, 656 (8ᵗʰ Cir. 2009).  However, "the custom or policy need not have 'received formal approval,'" because "informal practices of government officials can be as injurious as established policies."  *Steele v. Van Buren Pub. Sch. Dist.*, 845 F.2d 1492, 1495 (8ᵗʰ Cir. 1988) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)).

The ADC's Policy and Procedure Manual states that "[i]nmates are not allowed to wear wigs or hairpieces unless approved by the Operations Lieutenant," and no specific reference is made to religious exceptions or accommodations.  (Fisher Aff. ¶ 3, Ex. 14 at 431, Nov. 21, 2018, Docket No. 84.)  Furthermore, Sergeant Werner, who has worked for the RCSO for 17 years, (*see* 2d Werner Dep. at 311), testified extensively regarding the ADC's policies on the wearing of headscarves and the booking photo requirements.  She testified that, when Al-Kadi was booked, policy would not allow her to keep her hijab.  She also testified that, at that time, the ADC only took one booking photo, without any head coverings.  This evidence is more than sufficient to create a dispute of material fact as to whether the ADC had a custom, policy, or practice that was responsible for the substantial burden.[6]

---

[6] Defendants argue that Al-Kadi must produce evidence that her rights were violated based on an **unconstitutional** custom, policy, or practice, citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).  In *Tuttle*, the Supreme Court said that "some limitations must be placed on establishing municipal liability through policies that are not themselves unconstitutional or the test set out in *Monell* will become a dead letter."  *Id.*  But the Supreme Court made that statement in

### 3. Merits

Turning to the merits, the Court will find that Al-Kadi's RLUIPA claim survives to the extent that it is based on removal of her hijab in front of Frerichs and for the booking photo because a genuine dispute of material fact remains as to whether these actions substantially burdened her ability to exercise her religion and whether the related policies were the least restrictive means of furthering a compelling government interest. However, the Court will grant summary judgment for Defendants on Al-Kadi's RLUIPA claim as to the bedsheet policy because case law precludes finding that the policy substantially burdened her religious exercise.

### a. Substantial Burden

The threshold issue in a RLUIPA claim is whether a government policy or practice substantially burdened a plaintiff's ability to exercise her religion. *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 832 (8th Cir. 2009). To constitute a "substantial burden," a government policy or action must either: (1) "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs;" (2)

---

the context of discussing the need for "an affirmative link between the policy and the particular constitutional violation alleged." *Id.* The Supreme Court noted that "if one retreats far enough from a constitutional violation[,] some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official; for example, Rotramel would never have killed Tuttle if Oklahoma City did not have a 'policy' of establishing a police force." *Id.*

*Tuttle* does not require that the policy itself be unconstitutional but rather requires that there be a close connection between the policy and the constitutional violation. *Tuttle* clarified that *Monell* requires the contested policy be "the moving force of the constitutional violation." *Id.* at 819 (quoting *Monell*, 436 U.S. at 694). If the policy itself is constitutional, more proof may be necessary to establish the fault of the municipality and the causal connection between the policy and the constitutional violation. *Id.* Here, there is a direct link between the contested policy and the alleged constitutional violation.

"meaningfully curtail a person's ability to express adherence to his or her faith;" or (3) "deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Id.* (quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 987 (8th Cir. 2004). While RLUIPA bars inquiry into whether a particular belief or practice is central to an inmate's religion, it does not preclude inquiry into the sincerity of an inmate's belief. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13 (2005).

A substantial burden occurs "when [a] regulation's effects go beyond being an inconvenience . . . and instead put substantial pressure on [the plaintiff] to change [his or her] exercise." *First Lutheran Church v. City of St. Paul*, 326 F. Supp. 3d 745, 761 (D. Minn. 2018) (collecting cases). In *Holt*, the Supreme Court described substantial burden as a policy that requires a plaintiff to choose between violating his or her religious beliefs and facing disciplinary action. 135 S. Ct. at 862. *Holt* involved a RLUIPA challenge to a grooming policy that required the plaintiff to shave his beard, even though he believed growing a beard to be a dictate of his religious faith. *Id.* The Supreme Court found that the plaintiff "easily satisfied [his] obligation to show a substantial burden" because he was forced to choose between violating his religious beliefs or facing serious disciplinary action. *Id.*

As to forcing Al-Kadi to remove her hijab for a patdown, there remains a genuine dispute of material fact regarding whether this policy or practice substantially burdened Al-Kadi's ability to exercise her religion. Viewing the facts in the light most favorable to Al-Kadi, Defendants placed significant pressure on her to violate a central tenet of her religious exercise, including threatening her with disciplinary action if she failed to

comply. When Al-Kadi did not immediately comply with officers' requests to remove her hijab in front of men, she was deemed "uncooperative,"[7] placed in a separate holding cell alone, and eventually placed in a 23-hour lock in.[8]

Defendants note that Al-Kadi's head was only uncovered in the presence of a man once for about 44 seconds, and for ten of those seconds he was looking away. Defendants cite numerous cases finding that single, isolated incidents do not constitute a substantial burden.[9] However, these cases are not binding and were decided before the Supreme Court's decision in *Holt*. Furthermore, none of these cases involved a Muslim woman who

---

[7] The parties dispute whether Al-Kadi was "uncooperative" and whether their actions were justified based on her conduct. This dispute is a question of fact for the jury. A reasonable jury could conclude that Defendants deemed her "uncooperative" simply for requesting a religious accommodation.

[8] Defendants argue that Al-Kadi did not mention the 23-hour lock in in the Complaint and should not be permitted to amend her Complaint through the brief. The Court finds that her allegations were sufficient to put Defendants on notice of the basis for her claim. While the words "lock in" were not specifically mentioned, Al-Kadi alleged that she "was told that if she didn't cooperate, she would be transferred to an underground cell for people who refused to follow the rules." (2d Am. Compl. ¶ 41.) She also alleged that she stayed in her cell alone overnight. (*Id.* ¶ 64.) Even if these allegations could not be read to cover the lock in, the fact that she was threatened for noncompliance is enough to bring this case within the realm of *Holt*.

[9] *See, e.g., Brown v. Graham*, 470 F. App'x. 11, 15 (2d Cir. 2012) (failure to provide a kosher meal on one occasion not substantial burden); *Strope v. Cummings*, 381 F. App'x 878, 882 (10th Cir. 2010) ("inconvenience of non-preferred or occasionally unsatisfactory items in a [kosher] meal" not substantial burden); *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (failure to provide religious meal on three occasions not a substantial burden); *Joe v. Nelson*, No. 5:14-CV-0184, 2014 WL 2930856, at *4 (M.D. Ga. June 27, 2014) (single or isolated incident of standing water on floor causing plaintiff to miss four prayers in one day not a substantial burden on the exercise of his religion); *Davis v. Doe*, No. 1:14CV373, 2014 WL 1835853, at *2 (M.D.N.C. May 8, 2014) (missing part of one religious service not substantial burden); *Pfeil v. Lampert*, 11 F. Supp. 3d 1099, 1111-12 (D. Wyo. Mar. 31, 2014) (single missed visit with minister not substantial burden where plaintiff continued to have access to other ceremonies); *Stepler v. Warden, Hocking Correctional Facility*, No. 2:12–cv–1209, 2013 WL 3147953, at *12 (S.D. Ohio June 18, 2013) (delay in lighting Menorah not substantial burden).

practices hijab being threatened with punishment for refusal to remove her hijab in front of males. The facts of this case are substantially similar to the facts of *Holt*; thus, the Court finds that a reasonable jury could conclude that forcing Al-Kadi to remove her hijab in front of a male officer, even for a short time, constituted a substantial burden because Al-Kadi faced punishment for refusing to do so.

As to forcing Al-Kadi to take a booking photo without her hijab, there remains a genuine dispute of material fact regarding whether this policy or practice substantially burdened Al-Kadi's ability to exercise her religion. Al-Kadi argues that taking a photo of her without her hijab was "the single greatest burden placed on [her] religious exercise with the most far-reaching consequences." (Pl.'s Mem. Opp. at 21, Nov. 20, 2018, Docket No. 80.) Under Minnesota law, a booking photo is public record and must be released upon request unless a narrow exception applies. Defendants argue that their actions were not RLUIPA violations because (1) they did not post her photo online, and (2) if they did release her photo, it was to comply with the law. But Defendants misunderstand the basis for Al-Kadi's claim. The violation consisted of taking the photo of her without a hijab. In doing so, "Defendants created a permanent, public record depicting Ms. Al-Kadi in a manner that is deeply contrary to her religious exercise of practicing hijab by dressing modestly." (Pl.'s Mem. Opp. at 22.) A reasonable jury could find that Defendants' action in creating this public record that is subject to public release "meaningfully curtail[ed] [Al-Kadi's] ability to express adherence to . . . her faith." *Gladson*, 551 F.3d at 832. [10]

---

[10] Notably, this violation may be more ongoing than the briefer viewing of Al-Kadi without her hijab by Frerichs. Assuming the photo was—and could be again in the future—viewed

As to the bedsheet policy, case law precludes the Court from finding that this policy substantially burdened Al-Kadi's ability to practice her religion. Al-Kadi testified that wearing a bedsheet was humiliating and that she did not view it as a suitable alternative to her hijab. However, she has not made any specific arguments regarding why the sheet did not serve the same purpose as her hijab.[11] Courts have held that detainees need not be afforded their preferred method of engaging in religious activity so long as the alternative provided serves the same purpose. *See, e.g., Jihad v. Fabian*, No. CIV. 09-CV-1604 (SRN/LIB), 2011 WL 1641767, at *8 (D. Minn. May 2, 2011) (no substantial burden where policy allowed plaintiff to cover his head with institution-issued headgear rather than plaintiff's preferred religious kufi) (citing *Rogers v. Scurr*, 676 F.2d 1211, 1216 (8th Cir.1982) (finding no constitutional violation in policy prohibiting prayer caps and robes outside religious services)).[12]

Applying these cases to the facts of the present case, the Court finds that Defendants are entitled to summary judgment on Al-Kadi's RLUIPA claim as to the bedsheet policy. While the Court is certainly sympathetic to Al-Kadi's feeling that the bedsheet was

---

numerous times by numerous unrelated males, it goes well beyond an "isolated incident," even continuing beyond her period of confinement.

[11] Indeed, Al-Kadi acknowledged that a hijab need not be made of a specific fabric "as long as it's not see-through" and that she could cover her arms, head, and neck with the sheet. (Al-Kadi Dep. at 20-21, 39, 79.)

[12] *See also Sanchez v. Earls*, 534 F. App'x 577, 578 (8th Cir. 2013) (no substantial burden for denial of crucifix to inmate because he did not allege that another crucifix would have been inadequate); *Hudson v. Dennehy*, 538 F. Supp. 2d 400, 412 (D. Mass. 2008) (prayer towels given to Muslim inmates served same purpose as prayer rugs; thus, no substantial burden on inmates' religious exercise), *judgment entered*, No. CIV.A. 01-12145-RGS, 2008 WL 1451984 (D. Mass. Apr. 11, 2008), *aff'd sub nom. Crawford v. Clarke*, 578 F.3d 39 (1st Cir. 2009).

humiliating, she has not argued that it was inadequate. Had she argued, for example, that the sheet was not a suitable alternative because it was transparent and thus did not fully cover her, the outcome might be different.

Finally, even if each of these instances taken in isolation did not substantially burden Al-Kadi's religious exercise, a reasonable jury could conclude that the cumulative impact of these practices and policies did so.

### b. Compelling Government Interest

Once a plaintiff has established a substantial burden, the Court considers whether the burden (1) furthered a compelling governmental interest and (2) was the least restrictive means of doing so. *See Gladson*, 551 F.3d at 833.

"Prison safety and security are compelling government interests." *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009). Nevertheless, "[t]he least-restrictive-means standard is exceptionally demanding . . . ." *Burwell*, 573 U.S. at 728. RLUIPA requires a focused inquiry, and the government must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 135 S. Ct. at 863 (quoting *Burwell*, 573 U.S. at 726). In doing so, the Court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723 (quoting Joint Statement at 16699, 146. Cong. Rec. (2000)).

As to requiring Al-Kadi to remove her hijab in front of Frerichs for a patdown, Defendants argue that searching detainees upon entry to the ADC is necessary for safety reasons, namely to prevent them from bringing in weapons or contraband that could be used to hurt themselves or others. These interests are undoubtedly compelling. But a genuine dispute of material fact remains regarding whether removal of Al-Kadi's hijab in front of Frerichs, a male officer, was the least restrictive means of furthering this compelling interest.

First, Defendants fail to explain why it was necessary for Frerichs to look at Al-Kadi as she removed her hijab, especially since they emphasize that he eventually looked away. (*See* Defs.' Mem. Supp. at 3, 13, 15.)

Furthermore, it is not clear why another female officer could not have helped with the patdown. Testimony as to the availability of female officers for the patdown is not clear, although other female officers were involved in other portions of the intake. Even if no female officers were in the booking area during the patdown, Defendants do not state that there were no other female officers in the facility or that it would have been impossible to bring in a female officer from another floor or another part of the facility to assist with the patdown. They also give no explanation for why they do not have at least two female officers available for patdowns to accommodate Muslim women who practice hijab, especially given the numerous female officers that were involved in other parts of the intake process, from transport to booking photos. Without more information, the Court cannot find that Defendants' actions were the least restrictive means.

As to the booking photo, Defendants argue that release of Al-Kadi's photo was the least restrictive means of furthering the compelling governmental interest of complying with Minnesota law. Again, they misunderstand that the violation consisted not of releasing the photo but of creating the public record by taking the photo. Defendants do not—and cannot—argue that the law required them to take a photo of Al-Kadi without her hijab. Nor do they make specific arguments regarding why photographing detainees without a hijab are essential for identification purposes.[13] Indeed, Al-Kadi notes that photos of women wearing hijabs are often used for important government identification purposes, including U.S. passports and Minnesota driver's licenses. While jail security concerns may be different, these other government identification policies lend credence to Al-Kadi's argument that less restrictive alternatives exist.

Finally, Defendants have produced no evidence that they considered alternative means of furthering their compelling interests. *See Fegans v. Norris*, 537 F.3d 897, 904 (8th Cir. 2008) (citing *Murphy*, 372 F.3d at 989)).

For these reasons, a genuine dispute of material fact remains as to whether Defendants' challenged policies and practices requiring Al-Kadi to remove her hijab in front of Frerichs and for the booking photo were the least restrictive means of furthering compelling government interests. As such, the Court will deny Defendants' Motion for Summary Judgment on Al-Kadi's RLUIPA claim.

---

[13] Defendants also fail to explain why a photo of Al-Kadi without her hijab would make her easier to identify throughout the ADC, especially given that the ADC allows her to wear a bedsheet to cover herself.

## C.    Constitutional Claims

The Court will grant Defendants' Motion for Summary Judgment on Al-Kadi's Free Exercise claim as to the individual defendants because it is barred by qualified immunity. As such, the Court must also grant the motion as to the county defendants.

The Court will deny Defendants' motion on Al-Kadi's Equal Protection claim as to the individual defendants because disputes of material fact remain. However, it will grant the motion on her Equal Protection claim as to the county defendants because the Equal Protection violation alleged does not stem from a county policy or practice.

### 1.    Against Individual Defendants

Qualified immunity protects government officials from liability for civil damages unless: (1) the facts demonstrate a deprivation of a constitutional right and (2) the implicated right was clearly established at the time of deprivation. *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court has the discretion to determine which prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Clearly established" means "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### a.    Free Exercise

As a preliminary matter, because Al-Kadi's RLUIPA claim based on being forced to wear a bedsheet in place of her hijab failed, any Free Exercise claim based on that ground

must also fail. *See Van Wyhe*, 581 F.3d at 657-58. As such, the Court considers only the removal of her hijab in front of Frerichs and for the booking photo.

The Court need not consider the first prong of the qualified immunity analysis because the Court finds that Al-Kadi's Free Exercise claim fails the second prong. Even if Al-Kadi could demonstrate a deprivation of a constitutional right, she cannot demonstrate that the right implicated was clearly established at the time of the violation.

The Eighth Circuit and several judges in this District have found that generally applicable restrictions on headwear within a detention facility are reasonably related to security and identification and thus do not violate free exercise. Given this context, reasonable officers would not have known that their actions violated Al-Kadi's constitutional rights.

In *Rogers*, the Eighth Circuit found no constitutional violation of the religious rights of Muslim prisoners where the prison prohibited wearing prayer caps and robes outside of religious services. 676 F.2d at 1215-16. The Eighth Circuit found that the prohibition was a reasonable method of preventing concealment of contraband. *Id.* In *Butler-Bey v. Frey*, the Eighth Circuit affirmed a district court's finding that a prison policy prohibiting the wearing of headgear in the prison visiting room, dining room, chapel, school, and administration building was reasonable and not an exaggerated response to valid security concerns. 811 F.2d 449, 451 (1987).

In *Daywitt v. Minnesota*, the Court adopted a report and recommendation recommending dismissal of a free exercise claim related to wearing religious apparel (suitcoats and yarmulkes) in an MSOP facility because there was no clearly established

right to do so.  Civ. No. 14-4526 (MJD/LIB), 2015 WL 4094199, at *9 (D. Minn. July 6, 2015) (citing *Pittman v. Jesson*, No. 12-CV-1410 (SRN/TNL), 2014 WL 4954286, at *24-25 (D. Minn. Sept. 30, 2014)).  In *Pittman*, the Court found no clearly established right to wear a Kufi at all times in an MSOP facility, citing *Rogers* and *Butler-Bey* in support of her conclusion.  2014 WL 4954286, at *24.

Writing on a clean slate, the Court might decide differently.  But given the context of these decisions, the Court cannot say that reasonable officers would have known that their actions violated Al-Kadi's constitutional rights.  *See Jones*, 675 F.3d at 1161.  As such, Al-Kadi cannot show that her right was clearly established, and the individual defendants are entitled to qualified immunity on her Free Exercise claim.

### b.     Equal Protection

The Court will deny Defendants' motion on Al-Kadi's Equal Protection claim as to the individual defendants because Al-Kadi has presented sufficient evidence from which a reasonable jury could find deprivation of a clearly established constitutional right.

To establish an equal protection claim, Al-Kadi must show that she was "treated differently from similarly-situated inmates and that the different treatment [was] based upon either a suspect classification or a 'fundamental right.'" *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815-16 (8th Cir. 2008) (quoting *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1016 (8th Cir. 2006), cert. denied, 550 U.S. 917 (2007)).  Religion is a suspect classification.  *Id.* at 816.  Al-Kadi must also show that the differential treatment "was motivated by intentional or purposeful discrimination."  *Id.*

Al-Kadi claims that, because she is Muslim and requested a religious accommodation, she was treated more harshly, subject to more limitations, and punished more severely than the other detainees at the ADC. Defendants argue that Al-Kadi was not treated differently and, even if she was, there was no discriminatory motive. These two issues turn on genuine disputes of material fact.

Viewing the facts in the light most favorable to Al-Kadi, a reasonable jury could find that she was treated differentially based on her religion and requests for religious accommodations. Al-Kadi testified that she was singled out, yelled at by officers, separated from the rest of the detainees, left alone in a holding cell for two hours, escorted through the booking area, forced to walk naked across the room in front of officers in contravention of ADC policy, and placed in a 23-hour lock in.

As to separation and placement in the holding cell, Defendants argue that "all inmates, regardless of religion, are placed in a holding room when they fail to cooperate with the booking process." (Defs.' Mem. Supp. at 33.) But a genuine dispute of material fact remains as to why Al-Kadi was placed in the holding room. Indeed, Defendants seem to acknowledge that Al-Kadi's first act of "noncompliance" was refusing to remove her hijab, which could easily be seen as a request for a religious accommodation. Essentially, the key question in this case is whether Al-Kadi's "noncompliance" consisted of anything more than a request for a religious accommodation.

As to the escort, Defendants argue that they did nothing more than show Al-Kadi to the different booking stations. The Court does not see anything particularly concerning in such conduct. Nevertheless, there is evidence that officers did not similarly escort other

detainees. Viewed alongside the other evidence, this conduct supports Al-Kadi's allegations that she was singled out, given less freedom, and subject to more vigilance.

As to being forced to change in front of female officers, Defendants make no arguments. It is reasonable to infer that similarly situated inmates were not treated the same way because ADC policy states that misdemeanor detainees should not be viewed naked. And treating Al-Kadi in contravention of policy certainly calls into question any argument that this incident was reasonably related to legitimate interests.

Finally, Al-Kadi was placed in a 23-hour lock in while other detainees were not. Defendants generally argue that their actions were mere reactions to Al-Kadi's non-compliance, but that is a question of fact requiring credibility determinations that must be left to the jury.

Viewing the facts in the light most favorable to Al-Kadi, a reasonable jury could also find evidence of discriminatory motive. Al-Kadi testified that she never acted in an aggressive manner and simply requested religious accommodations. Other evidence calls into question the truth of Defendants' assertions that their actions were simply responses to noncompliance. For example, Al-Kadi was not marked as being noncompliant on her intake form and the officers saw no need to write an incident report. Al-Kadi has thus satisfied the first prong of the qualified immunity analysis. A reasonable jury could find deprivation of a constitutional right.

Al-Kadi has also satisfied the second prong. She has shown that her right to be free from discriminatory treatment based on her religion was clearly established. The Court found that a plaintiff stated an actionable claim for equal protection based on race

discrimination when the plaintiff, a black MSOP patient, alleged that an officer defendant reprimanded him for engaging in "horseplay" but did not reprimand a group of white patients who were engaged in similar "horseplay." *Pittman*, 2014 WL 4954286, at *10. Here, Al-Kadi presents evidence of more than mere reprimands. There is evidence that she was subject to punishment that other detainees were not.

The Eighth Circuit has also made clear that detainees have a constitutional right not to be punished for exercising their constitutional rights, including their right to religious freedom. In *Rouse v. Benson*, the Eighth Circuit overturned a grant of summary judgment on an inmate's § 1983 claim because a reasonable jury could have found that the inmate had been transferred to another facility in retaliation for exercising his First Amendment right to practice his religion. 193 F.3d 936, 941 (8th Cir. 1999). While the *Rouse* court considered the issue in the context of a retaliatory transfer claim, its decision makes clear that an inmate has a constitutional right not to be punished more severely for attempting to exercise religious freedom. *See also Trobaugh v. Hall*, 176 F.3d 1087, 1088-89 (8th Cir. 1999) (inmates have constitutional right not to be placed in segregation in retaliation for exercising a constitutional right).

Given this context, reasonable officers would understand that their actions violated Al-Kadi's constitutional rights. *See Jones*, 675 F.3d at 1161. As such, the individual defendants are not entitled to qualified immunity on the Equal Protection claim, and the Court will deny Defendants' motion as to this claim.

## 2. Against County Defendants

Because the Court will grant summary judgment for the individual defendants on Al-Kadi's Free Exercise claim, it must also grant summary judgment for the county defendants on the claim. Municipal liability on a constitutional claim can only attach if individual liability is found on the underlying substantive claim. *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005); *Turpin v. County of Rock*, 262 F.3d 779, 784 (8th Cir. 2001).

The Court must also grant summary judgment for the county defendants as to the Equal Protection claim because there is no evidence that the individual defendants' differential treatment of Al-Kadi resulted from Ramsey County policies.

"A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell,* 436 U.S. at 692). Municipalities "are not vicariously liable under § 1983 for their employees' actions." *Id.* To impose liability on Ramsey County, Al-Kadi must show that the individual defendants' actions were "pursuant to official municipal policy." *Id.* (quoting *Monell*, 436 U.S. at 691). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* at 61.

Al-Kadi's Equal Protection arguments are not based on the ADC policies requiring removal of her hijab. Rather, she argues that the individual defendants treated her more harshly because of her religion and her attempts to request a religious accommodation.

Because there is no evidence that this differential treatment was caused by a Ramsey County policy or practice, the individual defendants' actions are not "action[s] for which [the county defendants] [are] actually responsible." *Id.* at 61 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479-80 (1986)).[14] The Court will therefore grant the county defendants summary judgment on Al-Kadi's Equal Protection Claim

### D.    State Law Claims

Because the Court will deny summary judgment on Al-Kadi's RLUIPA and Equal Protection claims, the Court will exercise pendant jurisdiction over her state law claims.

### 1.  Minnesota Constitutional Claim

Defendants argue that the Court must dismiss Al-Kadi's state law constitutional claims because there is no private cause of action under the Minnesota Constitution. *See, e.g. Jihad*, 2011 WL 1641885, at *8 ("Minnesota has not enacted a statue that is equivalent to Section 1983, which provides a private cause of action for violations of the Federal Constitution."); *Mlnarik v. City of Minnetrista*, No. A09-910, 2010 WL 346402, at *1 (Minn. Ct. App. Feb. 2, 2010). But Minnesota case law suggests otherwise as it relates to the section under which Al-Kadi brings her claim:  Article I, § 16 of the Minnesota Constitution. *See Brooks*, 881 F. Supp. 2d at 1053 n.12 (collecting cases). Indeed, Minnesota courts have recognized the right of a private party to sue under this section of

---

[14] Al-Kadi argues that Ramsey County failed to train the individual defendants on how to accommodate Muslim inmates, but this argument is more relevant to her Free Exercise claim. To the extent that failure to train could support Al-Kadi's Equal Protection claim, she made no such allegations in her Complaint, and the Court will not consider them now.

the Minnesota Constitution. *Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad.*, 788 F. Supp. 2d 950, 957 (D. Minn. 2011) (collecting cases). Consistent with these cases, the Court concludes that Al-Kadi may bring this claim under Article I, § 16.

Article I, § 16 states that "[t]he right of every man to worship God according to the dictates of his own conscience shall never be infringed; . . . nor shall any control of or interference with the rights of conscience be permitted." Minn. Const. art. I, § 16. Minnesota courts "have construed [Article I, § 16] to afford greater protection for religious liberties against governmental action than the first amendment of the federal constitution." *Hill-Murray Fed'n of Teachers, St. Paul, Minn. v. Hill-Murray High Sch., Maplewood, Minn.*, 487 N.W.2d 857, 865 (Minn. 1992). In considering claims under Article I, § 16, Minnesota courts apply a standard similar to that which governs RLUIPA claims. Minnesota courts apply the "compelling state interest balancing test," which has four considerations: (1) "whether the objector's belief is sincerely held;" (2) "whether the state regulation burdens the exercise of religious beliefs;" (3) "whether the state interest in the regulation is overriding or compelling;" and (4) "whether the state regulation uses the least restrictive means." *Id.* (citing *State v. Hershberger*, 462 N.W. 2d 393, 398 (Minn. 1990)).

The Court finds, consistent with its analysis of the RLUIPA claim, that Al-Kadi's Minnesota constitutional claim can also proceed to the extent that it is based on removal of her hijab in front of Frerichs during the patdown, taking a booking photo of her without her hijab, and the cumulative effect of Defendants' conduct.

### 2. MHRA Claim

Defendants argue that they are entitled to summary judgment on Al-Kadi's MHRA claim because she has not presented evidence of discriminatory motive. *See Thomas v. City of St. Paul*, 526 F. Supp.2d 959, 968 (D. Minn. 2007). The Court's conclusion with regard to motive on Al-Kadi's Equal Protection claim applies equally here. Viewing the facts in the light most favorable to Al-Kadi, there is sufficient evidence in the record from which a reasonable jury could find that Defendants had a discriminatory motive. As such, the Court will deny Defendants' motion as to the MHRA claim.

### E.    Injunctive Relief

The Court must decide whether Al-Kadi's claim for injunctive relief is moot. The Eighth Circuit has held that requests for injunctive relief under RLUIPA and § 1983 are moot when a plaintiff is no longer being held in the prison where the religious violations took place. *See Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012); *Wheeler v. Iowa State Penitentiary*, 358 F. App'x 759, 760 (8th Cir. 2009). It has also held that requests for injunctive relief are moot where the policy at issue is no longer being implemented. *See Dayringer v. Webster*, 547 F. App'x 799, 800 (8th Cir. 2013).

In this case, a request to enjoin conduct that was limited to Al-Kadi's time in detention is undoubtedly moot. However, Al-Kadi also seeks to enjoin Defendants from releasing her booking photo in the future without redacting her hair, neck, and shoulders. Such relief is not moot because "a cognizable danger of future violation exists," as there is "more than a mere possibility" that her photo will be released. *Rogers*, 676 F.2d at 1214.

The photo is a public record subject to release upon request. There is evidence that the photo was already requested and published. Further publication is likewise probable. The Court will thus deny Defendants' motion as to injunctive relief to the extent that such relief is limited to release of Al-Kadi's photo without redaction.

### F. Emotional Injury

The Court will deny Defendants' motion as to emotional injury damages. Because Al-Kadi was not a prisoner when she filed this action, the Prison Litigation Reform Act of 1995 does not apply to this action and does not preclude her claim for emotional injury damages. *See Doe ex re. Do v. Washington County*, 150 F.3d 920, 924 (8th Cir. 1998) (holding that the PLRA did not apply to plaintiff's case because he was not incarcerated or detained at the time of filing).

### G. Punitive Damages

The parties do not dispute that municipalities are immune from damages under § 1983 but dispute whether there is evidence to support punitive damages against the individual defendants. "Punitive damages may be awarded when a defendant's conduct is motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Williams v. Brimeyer*, 116 F.3d 351, 354 (8th Cir. 1997). Consistent with the analysis of discriminatory motive, and viewing the facts in the light most favorable to Al-Kadi, there remains a genuine dispute of material fact as to whether Defendants acted with the requisite intent or indifference to Al-Kadi's rights. There is evidence to support Al-Kadi's assertion that Defendants' disparate treatment of

her was motivated by discrimination or an intent to punish her for requesting a religious accommodation.  The Court will thus deny Defendants' motion as to punitive damages.

## II.    AL-KADI'S MOTION TO EXCLUDE EXPERT TESTIMONY

Al-Kadi moves to exclude the testimony of Defendants' expert, Odeh Muhawesh, arguing that his testimony is irrelevant, infringes on the roles of the jury and the Court, and is unduly prejudicial.  Al-Kadi does not dispute Muhawesh's qualifications as an Islamic scholar.  Rather, she argues that the expert opinion of a scholar of Islam does not belong in this case at all.  The Court agrees.

### A.    Standard of Review

Under Federal Rule of Evidence 702, expert testimony must satisfy three prerequisites to be admitted:  (1) the evidence must be relevant, meaning it must be "useful to the finder of fact in deciding the ultimate issue of fact"; (2) the witness must be qualified; and (3) the evidence must be reliable or trustworthy.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  The Court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence."  *Lauzon*, 270 F.3d at 686.

Ultimately, the Court "should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc*., 457 F.3d 748, 758 (8th Cir. 2006).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence." *Robinson v. Geico General Ins. Co.*, 447 F.3d 1096, 1100 (8ᵗʰ Cir. 2006) (quoting *Daubert*, 509 U.S. at 595).

Nevertheless, even when evidence is relevant, it may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

### B.      Muhawesh's Expert Opinions

The following opinions offered by Muhawesh are at issue:

First, Muhawesh opines that Al-Kadi "does not sincerely hold the belief of adhering to Islam's teachings about the proper wearing of Hijab." (Aff. of Virginia R. McCalmont ("McCalmont Aff.") ¶ 2, Ex. 1 ("Muhawesh Rep.") at 4, June 1, 2018, Docket No. 54-1.) His conclusion is based on his review of a TV interview with Al-Kadi, where her "arms repeatedly appeared almost to the elbows" and where she "did not attempt to cover her arms when they showed." (*Id*. at 5.) Muhawesh opines that a Muslim woman with a sincerely held belief in wearing hijab would not show any part of her body except for her face and hands. (*Id.*)

Second, Muhawesh opines that Al-Kadi "does not hold a sincerely held belief in wearing an abaya as part of her Muslim Hijab." (*Id.*) His conclusion is based on several instances of Al-Kadi appearing in public, including the same TV interview, without an abaya.

Third, Muhawesh opines that Al-Kadi "does not possess enough knowledge of Islamic Law to accurately adhere to its teachings or know when and how it applies." (*Id.*)

This opinion is based on Muhawesh's review of the video of Al-Kadi in the holding cell. (*Id.*) In Muhawesh's view, Al-Kadi did not follow the proper procedure to perform "Tayamum," or "Dry Ablution." (*Id.*) He also opines that she should have performed a "Water Ablution" instead of the Tayamum because water was available in the holding cell and that her seated prayer was "invalid" because there was no justification for not prostrating. (*Id.* at 5-6.)

Fourth, Muhawesh opines that Al-Kadi's "Islamic rights were not violated when an officer at the Ramsey County jail asked her to remove her 'Burka,'" because the officer's use of the term "Burka" was only intended to demean Al-Kadi's beliefs if the officer admitted that it was her intention to demean Al-Kadi. (*Id.*)

Fifth, Muhawesh opines that Al-Kadi's Islamic rights were not violated by giving her a bedsheet instead of her hijab because there is no specific requirement regarding the materials that a hijab must be made of, and the bedsheet comported with any hijab requirements. (*Id.* at 6-7.)

Sixth, Muhawesh opines that Al-Kadi's Islamic rights were not violated when she was asked to remove her headscarf and abaya in the presence of a male officer in the holding cell. (*Id.* at 7.) He explains that one of the Five Principles of Islam is known as "Do no harm," meaning that "all religious obligations may or must be overridden in the presence of circumstances that require them to be overridden." (*Id.*) In sum, Muhawesh opines that, because there were security concerns and another female officer was not available, there was no religious violation by the male officer viewing her for as long as needed to maintain safety. (*Id.* at 9.)

Seventh, Muhawesh opines that Al-Kadi's religious beliefs were not violated when she was asked to change clothes in the presence of two female officers as long as they asked her to remain in sight because they deemed her uncooperative and as long as requiring her to walk across the room naked was not done to humiliate her. (*Id.* at 9-10.) He bases this opinion on the same interpretation of Islamic law that supports his sixth opinion.

Eighth, Muhawesh opines that any statements made by officers to mock Al-Kadi are irrelevant to whether her sincerely held religious beliefs were violated. (*Id.* at 10.)

## C.    Admissibility

The Court finds that Muhawesh's first, second, and third opinions are inadmissible because they are irrelevant. Defendants argue that these opinions challenge the sincerity of Al-Kadi's beliefs. But Muhawesh's only basis for finding Al-Kadi's beliefs to be "insincere" is that her actions do not align with his view of how she **should** practice her religion based on his understanding of canonical scholarship. Muhawesh's views on how Al-Kadi should practice her faith are not relevant to whether her beliefs are sincere. "The fact that an individual's understanding of the origins or reasons for a particular religious practice may be mistaken, incomplete, or at odds with the understanding of other followers and even experts of his stated religion is 'beside the point' when determining whether his personal belief is religious and sincere." *Blount v. Johnson*, No. 7:04-CV-00429, 2007

WL 1577521, at *5 (W.D. Va. May 30, 2007) (quoting *Doswell v. Smith*, 139 F.3d 888, *3, No. 94–6780, 1998 WL 110161 (4th Cir. 1998)).[15]

The Supreme Court has recognized that "it is not within the judicial function and judicial competence to inquire whether [a] petitioner or [another follower of the same religion] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation." *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 716 (1981). Indeed, "[i]ntrafaith differences . . . are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses." *Id.* At issue is not whether Al-Kadi's beliefs are a correct interpretation of Islamic teachings but whether they are sincere. Muhawesh's opinions on what constitutes "accurate[] adhere[nce]" to the teachings of Islam, (Muhawesh Rep. at 6), are thus irrelevant.

Even if Muhawesh's first, second, and third opinions were marginally relevant to the sincerity of Al-Kadi's beliefs, the Court would exclude them because their limited probative value would be substantially outweighed by a danger of unfair prejudice, confusion, and misleading the jury. If presented with testimony by a trained Islamic scholar that Al-Kadi did not practice Islam in the way he believes she should according to Islamic teaching, a jury is likely give such testimony undue weight. A jury is also likely

---

[15] Evidence of nonobservance, while not "conclusive," is relevant. *Blount*, 2007 WL 1577521, at *6 (quoting *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988)). Thus, if Defendants believe video footage shows that Al-Kadi was not observing hijab in conformance with her asserted beliefs, they could offer such footage to impeach her sincerity.

to confuse the issue of whether her beliefs are sincere with whether they are aligned with canonical scholarship.

The Court also finds that Muhawesh's fourth, fifth, sixth, and seventh opinions, regarding whether Al-Kadi's rights under Islamic law were violated, are irrelevant and risk confusion or misleading the jury. The issue in this case is whether Al-Kadi's rights under the U.S. and Minnesota Constitutions were violated, not whether her rights under Islamic law were violated. Nor is the issue whether Defendants' actions constitute violations of Muhawesh's religious beliefs. As such, opinions four, five, six, and seven are irrelevant.

Furthermore, these opinions are likely to confuse or mislead the jury. A jury would likely conflate violation of Islamic rights with violation of Al-Kadi's religious freedom under the U.S. and Minnesota constitutions. The Court thus finds that these opinions should be excluded under Rule 403 because, even if they were marginally relevant, any limited probative value would be substantially outweighed by a danger of confusing the issues and misleading the jury.

Finally, Muhawesh's eighth opinion is also inadmissible because it infringes on the Court's role of explaining the law to the jury by offering a legal conclusion: that certain facts are "not relevant" to the outcome in this case. (Muhawesh Rep. at 10.) Federal Rule of Evidence 704 allows for some expert opinions that "embrace[] an ultimate issue." However, experts may not "replace the judge in explaining the law to the jury" nor may they replace "the role of the jury in applying the law to the facts before it." *Equal Employment Opportunity Comm'n v. 704 HTL Operating, LLC*, No. CV 11-845 (JCH/LFG), 2013 WL 12097631, at *6 (D.N.M. Oct. 10, 2013). A court may exclude

expert opinion testimony "if it is so couched in legal conclusions that it supplies the fact finder with no information other than what the witness believes the verdict should be." *Williams v. Wal-Mart Stores*, Inc., 922 F.2d 1357, 1360 (8th Cir. 1990). Muhawesh's eighth opinion is a legal conclusion that supplies the jury with no other useful information. It is also unreliable under Rule 702 because it is not supported by any explanation. As such, it is inadmissible.

The Court finds that all of the opinions offered by Muhawesh are inadmissible or, alternatively, should otherwise be excluded under Rule 403. As such, the Court will grant Al-Kadi's motion to exclude his testimony in full.

## CONCLUSION

The Court will grant Defendants' Motion for Summary Judgment as to Al-Kadi's RLUIPA claim based on wearing a bedsheet, as to her Free Exercise claim against all Defendants, as to her Equal Protection claim against the county defendants, and as to her claim for injunctive relief to the extent that it reaches any conduct beyond the booking photo. However, genuine disputes of material fact remain as to the remainder of Al-Kadi's claims and as to damages. The Court will thus deny Defendants' motion as to those issues.

Finally, because the Court finds that Muhawesh's opinions are inadmissible or, alternatively, should be excluded, the Court will grant Al-Kadi's motion to exclude his testimony.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion for Summary Judgment [Docket No. 65] is **GRANTED in part and DENIED in part** as described herein; and

2.      Plaintiff's Motion to Exclude Expert Testimony [Docket No. 73] is **GRANTED**.

Plaintiff is granted limited leave to amend the complaint only to address the threshold requirements of her RLUIPA Claim.


DATED:  June 12, 2019
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court